## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DELIVERY AGENT, INC. et al.,[1] | Case No. 16-12051 (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF JAMES JEFFREY HAGAN IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Jeffrey Hagan, do hereby declare as follows:

1.      I am chief financial officer of Delivery Agent, Inc., a corporation organized under the laws of Delaware.  I serve in a similar capacity for the other above-captioned debtors (collectively with Delivery Agent, Inc., "Delivery Agent," the "Company," or the "Debtors") in these cases filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I am generally familiar with the day-to-day operations of the Debtors and their affairs, books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

3.      To minimize the adverse effects of filing for bankruptcy protection on their businesses, the Debtors have requested various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtors to perform and

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows:  Delivery Agent, Inc. (8744), Musictoday, LLC (7995), Clean Fun Promotional Marketing, Inc. (6635), and Shop the Shows, LLC (n/a).  The notice address for all of the Debtors is:  300 California Street, 3rd Floor, San Francisco, California 94104.

meet those obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful resolution to these chapter 11 cases, and (c) best serves the Debtors' estates and creditors' interests.

4.      I submit this declaration in support of the First Day Motions and pursuant to 28 U.S.C. § 1746. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management, employees, and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

5.      Part I of this declaration describes the Debtors' businesses, the circumstances surrounding the commencement of these chapter 11 cases, and their secured and unsecured debt. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

DOCS_DE:209564.1 17973/001

# I.

## BACKGROUND

## COMPANY OVERVIEW

6.      Delivery Agent has developed one of the leading and most advanced platforms to monetize entertainment content (TV, movies, music, and sports) through an integrated suite of solutions built to help increase fan engagement and drive direct revenue generation.  In business for over a decade, the Company's solutions serve some of the world's largest media companies and consumer brands.  The Company currently has approximately 250 employees and is headquartered in San Francisco, CA, with offices in Denver, CO; Costa Mesa, CA; Crozet, VA; and New York, NY.

7.      The Company engages in three related businesses: (1) e-commerce, (2) promotional marketing (Clean Fun), and (3) television commerce or "t-commerce" (ShopTV).

### Businesses

A.    E-Commerce

8.      Delivery Agent provides an e-commerce platform to its partners through exclusive multi-year agreements that typically include revenue sharing provisions.  The Company currently powers hundreds of digital commerce storefronts, which offer thousands of products relating to TV shows, movies, music, sports and artists.  Delivery Agent operates a proprietary ecommerce technology platform and also provides in-house services that include website operations, product design, development, merchandising, order fulfillment, and customer service.

9.      In July 2014, the Company acquired Musictoday LLC, a full-service e-commerce company serving the music industry, that was spun off from Live Nation.  Musictoday has since been integrated into the Company's ecommerce business.

10.     The e-commerce business segment generated approximately $78 million in revenue in 2015.

B.     Promotional Marketing (Clean Fun)

11.     Delivery Agent operates a merchandising and promotional marketing company, through Clean Fun, that enables major entertainment, media, and consumer brands to address their business and marketing needs.  Their services include product design, product development, and account management.

12.     The Company acquired Clean Fun in September of 2013.

13.     The Clean Fun business segment generated approximately $30 million in revenue in 2015.

C.     Television Commerce (ShopTV)

14.     Delivery Agent launched a television commerce (t-commerce) platform called ShopTV.  The ShopTV platform enables brands to launch interactive advertising campaigns and also allows television audiences to shop directly from the television using the ShopTV app found within the smart hub of tens of millions of connected television devices.  Television commerce is an area of business pioneered by the Company and its strategic partners in the media, smart TV and advertising sectors.

15.     The television commerce business segment generated approximately $2 million in revenue in 2015.

**History of the Company**

16.     Delivery Agent raised its first round of venture funding in 2005 from Worldview Capital Management and Cardinal Ventures.  Since that date, the Company has raised additional funding from venture capital firms as well as strategic investors in the advertising and media sectors.

4

17.     The Company was built around the thesis that entertainment content, from television programming to infomercials, creates demand for products that is not easily acted upon by the viewer or monetized by the content owner.  A decade ago, the Company pioneered a platform that enabled the entertainment industry to monetize its content through commerce.  The first version of this platform enabled a viewer to go to a Delivery Agent-powered website, found within the framework of a media company's website, to purchase products seen in or relevant to the content being viewed.  In parallel, but behind the scenes, the Company's back-end database mapped products, from a catalog of tens of thousands, to a piece of entertainment content, serving contextually relevant products to the viewer.

18.     Over the last decade, and with increasing rapidity in recent years, viewing habits have changed and adapted, with viewers embracing new devices to consume content, including mobile devices and tablets.  Recognizing these shifts, the Company scaled and refined its platform to capture sales tied to the growing use of these second-screen devices and platforms.

19.     More recently, an increase in the number of internet-connected televisions ushered in the opportunity to bring commerce directly to the television itself, and the Company's platform continued to evolve and scale to keep pace with the commerce opportunities that arose as connectivity in the home has become more readily accessible.  In response, the largest manufacturers of connected television devices, from Smart TVs to streaming sticks, looked to the Company to help monetize their audience through commerce, a new revenue stream for that industry.  With media companies and OEM partnerships in place, the Company then began to introduce its platform to brand advertisers that were seeking to increase the return on investment of their television media buys.

20.     The Company's platform provides the ability to place an interactive component on top of a traditional television ad, enabling consumers to act in real time, and simultaneously providing brand advertisers with analytics heretofore only available in the digital ad world, allowing advertisers to optimize their TV ad campaigns in new and valuable ways.  The Company has built an eco-system of partners – media companies, device manufacturers, advertising agencies, and brands – that works together to enable t-commerce.

21.     In its history, the Company has:

- Generated more than $800 million in revenue since inception;

- Helped over 500 media and entertainment franchises directly generate revenue;

- Paid more than $200 million in direct revenue to the industry;

- Shipped 21 million products to 12 million consumers in over 200 countries; and

- Been the first to make significant progress in bringing television commerce to the market.

### Revenues

22.     The Company has two primary revenue streams: product revenue and advertising revenue.

- Product revenue is derived from two major sources: (1) the sale of products to end consumers via one of the company's commerce environments hosted on behalf of a media or brand client, or via the Company's own ShopTV, and (2) the sale of promotional consumer goods to entertainment, media, and corporate clients.

6

- Advertising revenue is derived from the sale of television advertising to brands and/or ad agencies interested in deploying an interactive call-to-action on–screen. This interactivity allows a brand/agency to engage viewers directly and in real-time, and subsequently provides access to data that can be used to optimize media creative, messaging and buying.

23.    The timing of the cash flows of each of the Company's businesses has a major impact on the Company's operations and liquidity. The e-commerce business brings revenue into the Company as orders are placed, typically from credit cards or other e-payment methodologies such as PayPal, while the related expenses, the cost of goods sold, and revenue sharing with media and entertainment or brand partners, are generally not paid until 30 to 90 days thereafter.

24.    In contrast, the Company's promotional marketing business (Clean Fun) generally pays suppliers on a purchase order basis within 15 days of placing the order, which is typically invoiced to the customer upon delivery or shortly thereafter, with revenue recognized upon collection of cash to satisfy the invoice, usually about 45 days after the order is fulfilled.

25.    Similarly, a requirement of the Company's advertising business is that the Company pay its revenue sharing partners within 30 days of an ad running; however, the company does not typically collect revenue from its advertising clients for as much as 60 to 90 days after an ad has run.

## EVENTS LEADING UP TO CHAPTER 11

26.    In late 2015 through the first quarter of 2016, a number of events occurred that impacted Delivery Agent's liquidity:

**General Market and Business Conditions**

A.    Volatility in Capital Markets

27.    Based upon extensive discussions with leading investment banks, analysts, and the public market buy-side investors, the company was on a path to file an initial public offering in late 2015 or early 2016.  In line with this strategy, the Company mandate was to focus on growth in its core markets.  As such, the company invested in and successfully grew top-line revenue over 30%.  By the third quarter of 2015, however, the capital markets began to show signs of weakness, and by the first quarter of 2016, the Company's investment banks advised that an IPO in the near-term would be unlikely.

B.    Discontinuation of the Company's Linear Advertising Business (The Band)

28.    In May 2010, the Company acquired The Band, Inc. ("The Band"),[2] a media agency based in Denver.  The Band acted as a sales representative for cable operators and satellite providers re-selling linear TV advertising inventory.  The Band also operated long-form shopping channels on behalf of its partners.  In the first quarter of 2016, as a result of a number of factors, including declining performance of existing deals and continued cash flow challenges due to the operating cycle of the business, the Company made the decision to discontinue the operations of the linear advertising business.  The shut-down of The Band reduced the Company's operating revenue by 38% and resulted in an unpaid accounts payable liability of approximately $20 million.  This unpaid accounts payable liability triggered several collection lawsuits from former clients of The Band, which are currently pending.

C.    Ongoing Challenges with E-commerce Business Economics

29.    The Company's e-commerce business, which currently generates the largest portion of the Company's revenues, has not achieved profitability for a number of reasons.

---

[2]    After its acquisition by Delivery Agent, The Band was merged into a newly-formed wholly-owned subsidiary of Delivery Agent, Inc., Debtor Shop the Shows, LLC.

DOCS_DE:209564.1 17973/001

These reasons include long-term contracts with some of the Company's partners that include minimum guaranteed revenue-sharing terms that are not sustainable in the current market, as well as the challenges of integrating the operations of the Musictoday business post-acquisition.

D.    Slower than Expected Maturity of the T-commerce Business

30.    Success of the Company's propriety t-commerce business segment depends upon significant scale and consumer adoption. The time to deploy the technology across enough devices, thereby driving mass consumer adoption, took longer than anticipated, and thus the subsequent high margin revenue from this channel has not materialized as quickly as the Company had hoped.

**Entry Into Secured Debt Facilities**

31.    In late 2015, Delivery Agent sought new or replacement financing and received such financing from Western Alliance Bank (the "Pre-Petition Accounts Receivable Lender" or "Western Alliance") and Hillair Capital Investments L.P. ("Hillair") in December 2015. Some of the proceeds were used to repay notes issued to Pinnacle Ventures LLC.

32.    On December 9, 2015, Western Alliance entered into a Business Financing Agreement (the "Senior Loan Agreement") with Delivery Agent, Musictoday, and Clean Fun, pursuant to which the Pre-Petition Accounts Receivable Lender lent the Debtors amounts against a borrowing base fixed against the Debtors' accounts receivable, which obligations are secured by a first lien on substantially all of the Debtors' assets.

33.    Delivery Agent concurrently issued to Hillair an 8% Original Issue Discount Secured Convertible Debenture due November 1, 2017 (the "Hillair Debenture"), in the principal amount of $9,280,000, which obligation is secured by a lien on substantially all of the Debtors' assets and subject to a Subordination Agreement between Western Alliance and Hillair, whereby

DOCS_DE:209564.1 17973/001

Hillair agreed to become the junior lender for purposes of the loan relationship between Hillair and Western Alliance.

### Attempts to Finance and Market the Business

34.    Notwithstanding the issuance of the Senior Loan Agreement and the Hillair Debenture, Delivery Agent anticipated the need to raise additional capital in 2016.  During the end of 2015 and early 2016, realizing the previously very active IPO market appeared to be slowing, the Company worked with its selected IPO underwriters to test the waters on a sales process.  Barclays and BMO worked together to contact strategic buyers to purchase the Company as an alternative to the IPO, but the process was ultimately not successful in identifying a buyer for the business.

35.    Concurrently, the Company approached potential debt and equity investors for additional funding.  However, capital markets cooled substantially in the winter of 2015, and the Company was unable to find additional investors willing to inject more capital into the Company on terms that were acceptable to the Debtors.  In July 2015, the Debtors entered into a Convertible Bridge Note Purchase Agreement with certain of its existing investors, pursuant to which it issued promissory notes in the approximate principal amount of $11 million.  In March 2016, the Debtors entered into a further agreement to purchase such notes from such investors, pursuant to which the Company issued additional promissory notes in the approximate principal amount of $9 million.  The proceeds of that issuance were used to finance operations while the Company explored further financing opportunities, including sale of equity.  These efforts continued through the spring of 2016 without yielding a long-term liquidity solution.

36.    Upon concluding both the Barclays process and the additional internal fundraising efforts described above, the Company determined that it needed to increase the scope of its efforts to approach additional strategic buyers, as well as investors who typically seek more

10

distressed situations. To that end, on May 18, 2016, Delivery Agent retained Houlihan Lokey ("Houlihan") to evaluate strategic alternatives and to engage in a marketing process of all of the Company's business segments. Houlihan began discussions with strategic and financial buyers in early June 2016 and continues to lead a robust marketing process that has been underway for more than three months. Houlihan has contacted over 150 potential interested parties, entered into confidentiality agreements and engaged in deeper discussions with a number of parties that expressed interest in all or parts of the business. Although Houlihan was able to identify a number of interested parties, who provided both formal and informal indications of that interest, no purchaser has yet emerged with a commitment to acquire some or all of the Company's business units.

### Decision to File Chapter 11

37.    By August 2016, with liquidity pressure increasing, it was projected that obtaining a firm purchase or financing commitment prior to exhausting the Company's remaining liquidity was unlikely. The Debtors explored their options with Houlihan and concluded that a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code would most likely maximize the value of the Debtors' assets. As no buyer or lender emerged from the process run by Houlihan and the Debtors, the Debtors requested that Hillair agree to become a stalking horse bidder and proposed DIP lender for the purposes of continuing the sale process in the context of a chapter 11 filing.

38.    The Company's cash concerns were compounded by the fact that in early September, the Pre-Petition Accounts Receivable Lender declared a default under the Senior Loan Agreement. Pursuant to section 5.12 of the Senior Loan Agreement, Delivery Agent was required to raise additional equity capital on or before March 8, 2016. In August 2016, the Pre-Petition Accounts Receivable Lender asserted that Delivery Agent was in default under the

11

Senior Loan Agreement for its failure to timely complete the equity raise, the notice of which was sent on September 5. Thereafter, the Pre-Petition Accounts Receivable Lender proceeded to sweep on a daily basis the Debtors' cash accounts and apply cash proceeds of the Debtors' accounts receivable, as it asserted it was entitled to do under the Senior Loan Agreement.

39. As a result of Pre-Petition Accounts Receivable Lender's cash sweeps, Delivery Agent's liquidity needs became critical.

40. After extensive negotiations, and at the Debtors' request, on September 8, 2016, Hillair agreed to advance $1,425,000 (the "Emergency Loan") to the Debtors pursuant to that certain Secured Promissory Note executed by Delivery Agent, Inc. and guaranteed by each of the other Debtors, including Shop the Shows. The Emergency Loan allowed the Debtors to pay expenses, vendors and also fund payroll, which the Debtors were at considerable risk of not being able to pay absent the Emergency Loan.

41. In order to facilitate the Debtors' efforts to execute the foregoing sale, Hillair agreed to (a) provide the Emergency Loan, (b) provide post-petition debtor-in-possession financing, and (c) enter into an asset purchase agreement with the Debtors.

42. The Debtors approached other prospective financiers to determine if financing on the terms offered by Hillair, or better, are available to the Debtors in these Chapter 11 cases. They concluded that no such financing is available.

43. Due to the seasonal nature of Delivery Agent's business, it is of paramount importance that the Company has stability and funding to support its operations in the fourth quarter of 2016, when expected revenues and cash disbursements are the greatest. In light of Hillair's willingness to provide post-petition financing and support a Section 363 sale process that would result in a prompt sale transaction and minimal disruption to the holiday shopping

season, the Company's board decided that it was in the best interests of the Company and its

stakeholders to file this Chapter 11 pleading and pursue a Section 363 sale process.

44.     Therefore, in light of the foregoing, on September 14, 2016, Delivery Agent, Inc.,

Musictoday, LLC, Clean Fun Promotional Marketing, Inc., and Shop the Shows, LLC filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

**Secured Debt Facilities**

45.     Section 8(a)(iii) of the Hillair Debenture provides that a default under the Senior

Loan Agreement constitutes a default under the Hillair Debenture.  On September 8, 2016,

Hillair provided Delivery Agent with a Notice of Event of Default under the Hillair Debenture.

46.     As of the Petition Date, the principal amount owing under the Hillair Debenture,

inclusive of default amounts, is $12,064,000, plus accrued interest.  In addition, the principal

amount of $1,425,000 plus accrued interest remains owing to Hillair under the Emergency Loan.

47.     As of the morning of September 14, 2016, the outstanding balance owed to the

Pre-Petition Accounts Receivable Lender was approximately $156,000.[3]

48.     The Company also has capital leases with various providers for PP&E, including

equipment such as servers and switches used to operate and maintain the Company's platforms

and data centers. The outstanding principal value of such leases is approximately $3.2 million.

**Unsecured Debt**

49.     The Company has approximately $20 million of unsecured convertible notes held

by various entities, most of which are also the holders of the Company's equity. These notes

contain conversion features exercisable under various scenarios, including upon election of the

holders, a new financing round of $10 million or greater, an IPO, or an acquisition. The

---

[3]     I understand that the Debtors will fix the final outstanding balance under the Senior Loan as of the Petition
Date, which the Debtors expect to be less than $156,000 (due to continuing sweeps), at the time of the interim
hearing on the Financing Motion (as defined below).

Company also has a $500,000 unsecured note held by the seller of the Promotional Marketing (Clean Fun) business.

50.    In addition to these unsecured notes, the Company has other unsecured debt in the form of accounts payable of approximately $20 million related to the discontinued linear advertising business; approximately $17 million of revenue share related to the e-commerce business; approximately $9.5 million of vendor, accrued commissions and inventory accounts payable related to its e-commerce and promotional businesses; and approximately $2.1 million of professional fees.

## II.

## FIRST DAY MOTIONS

51.    To minimize the adverse effects on their business of seeking protection under chapter 11, and to maximize the value of their assets until the conclusion of the Section 363 sale process, the Debtors have requested various types of relief in the following First Day Motions, all of which are being filed concurrently with this Declaration.  For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interest of the Debtors' estates, creditors, and other parties-in-interest.

DOCS_DE:209564.1 17973/001

## SALE AND FINANCING MOTIONS[4]

A.     MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING
LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH
COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING
AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING ("FINANCING
MOTION")

52.     By the Financing Motion, the Debtors seek entry of orders, on an interim and final

basis, (i) authorizing the Debtors to obtain postpetition financing (the "DIP Financing") pursuant

to that certain *Senior Secured, Super-Priority Debtor-In-Possession Facility and Security*

*Agreement* (such agreement, as it may be amended from time to time, the "DIP Agreement," and

such facility, the "DIP Facility") together with the other agreements delivered or executed from

time to time in connection therewith (as hereafter amended, restated, supplemented or otherwise

modified from time to time, together with the DIP Agreement, the "DIP Documents") and the

budget attached to the Financing Motion as Exhibit B (the "Budget"); (ii) granting liens and

providing superpriority administrative expense status to the DIP Lender (as defined in the

Financing Motion); (iii) authorizing the Debtors to use Cash Collateral (as defined in the

Financing Motion) and affording adequate protection; (iv) modifying the automatic stay; and

(v) scheduling a final hearing on the relief requested in the Financing Motion.

### *Cash Collateral and DIP Financing*

53.     I understand that the Debtors' prepetition secured obligations are secured by first-

priority liens and security interests in substantially all of the Debtors' assets.  I have been advised

that those assets, and the proceeds thereof now owned or hereafter acquired by the Debtors,

constitute the Prepetition Collateral.  Substantially all of the Debtors' cash, including, without

---

[4]     Defined terms used in the balance of this declaration shall have the meanings ascribed to them in the
motions to which the paragraphs relate.

limitation, all cash and other amounts on deposit or maintained by the Debtors in their bank accounts (which bank accounts are subject to control agreements), as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, I have been advised, are cash collateral of the Pre-Petition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

54.     The Debtors intend to finance their business operations with cash generated by those operations, the continued use of Cash Collateral, and the DIP Facility. I understand that the DIP Facility will be secured by first-priority, valid, priming, perfected, and enforceable liens on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and with superpriority administrative expense claims and senior to all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained in the Interim Order and the Final Order. I also understand that the DIP Loan is not priming the Pre-Petition Accounts Receivable Lender's liens nor any pre-existing and prior perfected senior and valid liens. I believe that this arrangement will meet the Debtors' financing needs during these Chapter 11 cases. Specifically, the DIP Financing and use of Cash Collateral will provide the Debtors with much-needed liquidity, in order to permit, among other things, the operation of the Debtors' business and the sale of substantially all of the Debtors' assets.

55.     The DIP Agreement was negotiated in good faith and at arms' length by and among the Debtors, the DIP Lender, and their respective professionals. I believe that the terms thereof, the use of Cash Collateral, and all other financial accommodations provided under the DIP Agreement and the Orders are fair and reasonable and reflect the exercise of the Debtors' prudent business judgment consistent with its fiduciary duties. The Debtors have, in their

16

business judgment, determined that entering into the DIP Agreement will give the Debtors the financing needed to operate their business with minimum interruption or disruption to their operations and thus preserve the going-concern value of the Debtors' estates. In addition, the Debtors have, in their business judgment, determined that the DIP Financing provides the Debtors with the greatest degree of flexibility to implement their Chapter 11 strategy.

56.     As described in Part I above, the Debtors negotiated the DIP Financing only after carefully examining all available options. I have made several inquiries and determined that the Debtors will not be able to obtain a facility on equal to or better terms than those of the DIP Facility. In addition, the Debtors were unable to obtain financing on an unsecured basis or obtain an equity investment from any potential strategic partner. In the end, the DIP Lender provided the only viable source of funding. Accordingly, the Debtors commenced arm's length and good-faith negotiations with the DIP Lender for the DIP Financing. The DIP Lender would not otherwise agree to lend without the protections being afforded it under the DIP Agreement.

57.     After fully considering their financing options, and whether other more advantageous financing alternatives would be available to the Debtors, and with the assistance of their advisors, the Debtors exercised their business judgment and accepted the DIP Financing with the DIP Lender. I believe that the DIP Financing provides significant advantages and favorable terms that would be unavailable through other lenders. Further, I note that Hillair, which will be primed by the liens granted to the DIP Lender, and the Pre-Petition Accounts Receivable Lender have both consented to the relief requested herein.

58.     In connection with the DIP Financing and use of Cash Collateral, I understand that the Debtors propose to provide the Pre-Petition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code. To that end, the Debtors and

17

the Pre-Petition Secured Parties have negotiated the adequate protection of the interests of the

Pre-Petition Secured Parties in the Prepetition Collateral described in the Financing Motion. I

believe that the adequate protection described in the Financing Motion is fair, reasonable, and

sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in

the Prepetition Collateral during the period their collateral is used by the Debtor.

59.     I believe that the terms and conditions of the DIP Financing are fair and

reasonable. I understand that the proposed DIP Financing subjects the security interests and

administrative-expense claims of the DIP Lender to the Carve-Out, as described in the Financing

Motion, thereby ensuring that in the event of a default under the DIP Agreement, the Debtors'

estates or other parties-in-interest are not directly or indirectly deprived of possible rights and

powers by restricting the services for which professionals may be paid in this case.

60.     The Debtors must immediately instill the Debtors' employees, vendors, service

providers, and potential bidders with confidence that these Chapter 11 cases will not erode the

Debtors' overall value. I believe that the Debtors must provide their various constituents with

confidence in their ability to seamlessly transition their business into Chapter 11, operate their

business normally in that environment, and ultimately sell their business in a successful and

expedient manner. I believe that the DIP Financing will provide the working capital necessary to

allow the Debtors to, among other things, continue operating the business in the ordinary course

of business, which in turn will help maintain value for the benefit of all creditors and parties in

interest.

61.     I believe that the success of these Chapter 11 cases at the outset depends on the

confidence of the Debtors' constituents, which in turn depends upon the Debtors' ability to

minimize the disruption of the bankruptcy filings. I further believe that approval and

implementation of the DIP Financing will assure continued functioning of the Debtors and preserve the going concern value of their estates.

***Interim Relief***

62.    The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these Chapter 11 cases, to (i) operate the Debtors' business; (ii) maintain business relationships with vendors, and suppliers; (iii) pay employee wages in the ordinary course; (iv) make necessary capital expenditures; (v) satisfy other working capital and operational needs; (vi) pay professional fees; and (vii) finance the sale process, all of which are necessary to preserve the Debtors' going-concern value.  I believe that without the use of Cash Collateral and the additional liquidity, the Debtors would not be able to meet their day-to-day operational needs.  If unable to meet the day-to-day operational needs, the Debtors would have to halt their operations, which I believe would drastically erode their overall value.  Further, the Debtors must demonstrate to their vendors and employees that they have sufficient capital to ensure ongoing operations in the ordinary course, thereby assuaging any potential fears among the constituents of the Debtors that these Chapter 11 cases will negatively affect the Debtors' operations.

63.    Accordingly, I believe that it is critical that the Court enter the Interim Order attached to the Financing Motion on an expedited basis, and modify the automatic stay to implement the terms of the DIP Agreement, allowing the Debtors to obtain credit under the DIP Agreement, which the Debtors will use in accordance with the Budget to, among other things, provide working capital for the Debtors and pay their expenses for their Chapter 11 cases.  I believe that such expedited relief is necessary in order to avoid the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors did not obtain the financing

needed to sustain the Debtors' business as a going concern pending the final hearing on the

Financing Motion.

B.    MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE
      ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE
      BIDDING PROCEDURES, (C) AUTHORIZING AND APPROVING A BREAK-UP
      FEE AND EXPENSE REIMBURSEMENT, (D) APPROVING THE NOTICE
      PROCEDURES, AND (E) SETTING A DATE FOR THE SALE HEARING, AND (II)
      AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE
      AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS
      AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS
      ("SALE MOTION")[5]

      64.    By the Sale Motion, the Debtors seek entry of orders (i)(a) approving the Debtors'

entry into the Asset Purchase Agreement among the Debtors, as sellers, and the DIP Lender, as

"stalking horse" purchaser (together with its assignees or designee(s), "Buyer") (substantially in

the form attached to the Sale Motion as Exhibit B), (b) authorizing and approving the Bidding

Procedures, (c) authorizing and approving the terms and conditions of the Break-Up Fee and

Expense Reimbursement, including granting administrative expense status to the Break-Up Fee

and Expense Reimbursement, (d) approving the form and manner of sale notices, and (e) setting

the time, date and place of the Sale Hearing; and (ii) authorizing and approving (a) the sale of the

Debtors' right, title and interest in the Assets free and clear of all Liens, claims, encumbrances,

and interests (each as described in the Sale Motion), except as set forth in the Agreement and

(b) the assumption and assignment of certain executory contracts and real property leases

pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such other and further

relief as the Court deems just and proper.

      65.    As described in Part I above, after extensive arm's length, good faith negotiations

among Sellers and the DIP Lender, as Buyer, and their respective advisors, the Debtors have

---

[5]    The Debtors are not seeking "first day" relief in the Sale Motion, but the Sale Motion will be filed on or
shortly after the Petition Date, and the facts supporting the Sale Motion are set forth in this declaration.

DOCS_DE:209564.1 17973/001

determined, and I believe, that the Agreement represents the best opportunity for the Debtors to maximize the value of their assets and serve as a basis for conducting an auction to seek higher and/or better offers.

### Bidding Procedures

66.     I believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates and their creditors. I further believe that the benefit to the Debtors' creditors will be adversely affected absent a prompt sale.

67.     I believe that the Sale Notice (as defined in the Sale Motion) and the notice procedures described in the Sale Motion provides is sufficient to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction (if necessary), and the Sale Hearing, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

68.     Finally, I believe that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

### Bid Protections

69.     I believe that Buyer and its advisers have expended, and will likely continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and the assumption and assignment of the Assumed Agreements, and have engaged in intensive, extended, good faith negotiations. The Agreement is the culmination of these efforts.

70.     In recognition of this expenditure of time and expense, the Debtors have agreed that if Buyer is not the Successful Bidder, the Debtors will, to the extent due under section 4.5 of

the Agreement, pay Buyer (a) a Break-Up Fee of five hundred thousand dollars ($500,000),

which is less than 3% of the aggregate Purchase Price and (b) Buyer's reasonable fees, costs and

expenses (including, without limitation, consultants' and attorneys' fees, costs and expenses)

incurred in connection with the transactions contemplated by this Agreement through the date of

termination, including any such Person employed by any of Buyer's Affiliates, not to exceed in

the aggregate $350,000 minus amounts paid by Sellers to the DIP Agent as adequate protection,

prior to such termination, for such fees, costs and expenses as provided in any DIP Order, which

shall be payable as provided for pursuant to the terms of the Agreement. I believe that the

Buyer's agreement to be a stalking horse purchaser under the bidding process proposed in the

Motion will help to induce prospective competing bidders to expend the time, energy and

resources necessary to submit a bid. I believe that the Bid Protections are (a) an actual and

necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the

Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in

interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that Buyer will

continue to pursue the proposed Agreement to undertake the sale of the Assets.

***Good Faith Purchaser and No Collusive Bidding***

      71.    Over the weeks leading up to the filing of these chapter 11 proceedings, the

Debtors have spent a considerable amount of time and resources negotiating the Agreement in

good faith at arm's length, with give and take on both sides and without collusion. Accordingly,

I believe that Buyer is a good faith purchaser and is entitled to all of the protections of

Bankruptcy Code section 363(m).

      72.    I also do not believe that the proposed sale of the Assets will be the result of

collusion or other bad faith between bidders or that the purchase price under the Agreement has

been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

### *Sale Free and Clear*

73.    I do not believe that Buyer would have entered into the Agreement and would consummate the Transaction if the sale of the Purchased Assets to Buyer was not free and clear of all Liens, claims, encumbrances, or interests, or if Buyer would, or in the future could, be liable for any of such Lien, claim, encumbrance, or interest. I also believe that sale of the Purchased Assets other than one free and clear of all Liens, claims, encumbrances, or interests would yield substantially less value for the Debtors' estates, with less certainty than the transaction contemplated in the Agreement. Therefore, I believe that the transaction contemplated by the Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

### *Waiver of Automatic Fourteen-Day Stay*

74.    I have been advised that, pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Pursuant to the Agreement, and because of the potentially diminishing value of the Assets, the Debtors must close the sale of the Assets promptly after all closing conditions have been met or waived. Thus, I believe that waiver of any applicable stays is appropriate in this circumstance.

### *Motion to Shorten Notice*

75.    Concurrently with the Sale Motion, the Debtors will file a motion to shorten notice of the Sale Motion if necessary to have the Court consider the Bidding Procedures Order on the same date as the final hearing on the DIP Motion. I have been advised that, if time is not

shortened, under the time periods prescribed under the Bankruptcy Rules and Local Bankruptcy Rules, the final hearing on the DIP Motion may take place a few days before a hearing on the Bidding Procedures Order.  I believe that a prompt hearing on the Sale Motion is in the best interests of the Debtors' estates, both because of the Debtors' need to consummate a sale of the Assets promptly, as set forth above, and because shortening the period for notice of the hearing to consider the Bidding Procedures Motion, such that it may be heard at the same time as the final hearing on the DIP Motion, will save the Debtors and other parties in interest, and their respective professionals, the time and expense of attending multiple hearings a few days apart.

### MOTIONS RELATED TO DEBTORS' OPERATIONS IN CHAPTER 11

C.      MOTION FOR AN ORDER (I) APPROVING DEBTOR'S PROPOSED MODIFICATIONS TO THEIR CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS; (II) GRANTING THE DEBTORS AUTHORITY TO OPEN AND CLOSE BANK ACCOUNTS; AND (III) AUTHORIZING BANKS TO HONOR CERTAIN PREPETITION TRANSFERS ("CASH MANAGEMENT MOTION")

76.     By the Cash Management Motion, the Debtors seek an order of this Court (i) approving the Debtors' proposed modifications to their current cash management system, existing bank accounts (the "Bank Accounts"), and business forms; (ii) authorizing the Debtors to open and close bank accounts; and (iii) authorizing all banks participating in the current Cash Management System to honor certain prepetition transfers.

*The Debtors' Current Cash Management System*

77.     As of the Petition Date, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations.  Initially, the Cash Management System was located at Silicon Valley Bank.  These accounts were used in connection with a Loan and Security Agreement between the Debtors and Silicon Valley Bank dated November 23, 2011, which loan the Debtors paid off on June 5, 2014.  On December 9, 2015, the Debtors

24

entered into the Senior Loan Agreement with the Pre-Petition Accounts Receivable Lender, Western Alliance Bank, and in connection with that loan, the Cash Management System moved to Western Alliance Bank dba Bridge Bank.  Since that date, the Silicon Valley Bank accounts have been used sparsely and are not an active part of the Cash Management System. Additionally, Debtors opened accounts at First Republic Bank on September 7, 2016 in connection with the Emergency Loan described above.

78.     Attached to the Cash Management Motion as Exhibit A is a chart demonstrating the flow of funds through Debtors' Bank Accounts as of the Petition Date.  Attached to the Cash Management Motion as Exhibit C is a schedule of the Bank Accounts as of the Petition Date. Debtors' Cash Management System functions as follows:[6]

### a.     **The Bridge Bank Accounts**

79.     The Deposit Accounts.  As the Debtors receive payments from their retail, promotional, and advertising businesses, cash receipts flow into accounts maintained by the Debtors' various business units (collectively, the "Deposit Accounts").  The Deposit Accounts are zero-balance accounts and only carry a cash balance in the event a payment was received following the daily sweep.

80.     The San Francisco Main Account.  The centerpiece of the Debtors' Cash Management System at Bridge Bank is its main operating account (the "San Francisco Main Account"), which is held in the name of Delivery Agent, Inc. but uses the funds of all Debtors. Each evening at or about the close of business, cash is swept from each of Debtors' Deposit Accounts into the San Francisco Main Account.

---

[6]     The Debtors' Cash Management System functioned similarly when it was located at Silicon Valley Bank in 2011-2015.

81.    <u>The Operating Accounts</u>.  After funds are swept from the Deposit Accounts to the San Francisco Main Account, the next business day funds held in the San Francisco Main Account are transferred to the disbursement accounts held by the Debtors at their various operating locations, which either are related to the Debtors' different business units or tied to business obligations like payroll (collectively, the "<u>Operating Accounts</u>").  These Operating Accounts are used to wire funds or cut checks to vendors and the Debtors' employees.

82.    <u>Loan Repayment Account</u>.  Before the Petition Date, the Debtors' funds were used to repay loans with the bank.  Funds were swept from the San Francisco Main Account to pay interest on the loan on a monthly basis.  In August 2016, Bridge Bank asserted its right to sweep directly from the Deposit Accounts, which it did daily.  Thereafter, the Deposit Accounts no longer swept into the San Francisco Main Account, but rather to Bridge Bank's cash collateral account.  Bridge Bank would transfer money from its cash collateral account to the San Francisco Main Account at Debtors' request, if Debtors had sufficient accounts receivable to support the transfer.

**b.    The First Republic Bank Accounts**

83.    After the Pre-Petition Accounts Receivable Lender began sweeping cash in the Bridge Bank Account, the DIP Lender provided the Emergency Loan as described above.  In connection with the Emergency Loan, the Debtors opened the First Republic Bank Accounts (defined below), through which the Cash Management System functions similarly to the way in which it functioned prior to the making of the Emergency Loan, as described more fully below.

84.    <u>The First Republic San Francisco Main Account</u>.  The DIP Lender funded the main operating account on September 7, 2016 in connection with prepetition financing (the "<u>First Republic San Francisco Main Account</u>").  In addition to using the First Republic San

Francisco Main Account to fund the other First Republic Operating Accounts (as defined below), the Debtors also use this account as the Operating Account for their operations in San Francisco, California.

85.    The First Republic Operating Accounts.  As needed, funds held in the First Republic San Francisco Main Account are transferred to the disbursement accounts affiliated with Debtors' operations in Crozet, Virginia, and Costa Mesa, California or tied to business obligations like payroll (collectively, the "First Republic Operating Accounts").  These First Republic Operating Accounts are used to wire funds or cut checks to vendors and the Debtors' employees.

86.    As discussed below, the Debtors intend to open debtor-in-possession accounts at Silicon Valley Bank.

***Modifications to the Cash Management System Required by the DIP Credit Facility***

87.    The Debtors intend to open new bank accounts funded by the DIP Lender postpetition (the "DIP Cash Management System").  The DIP Cash Management System will be located at Silicon Valley Bank.  All accounts will include "Debtor in Possession" in the account holder's name.

88.    The Debtors will migrate their existing Cash Management System to Silicon Valley Bank, such that the DIP Cash Management System will function in largely the same fashion as the prepetition Cash Management System.  The DIP Lender will fund a main operating account (the "DIP Main Account"), akin to the San Francisco Main Account.  One or more Deposit Accounts linked to the Debtors' business units (the "DIP Deposit Accounts") will be swept daily into the DIP Main Account, similar to the function of the prepetition Deposit Accounts.  At intervals to be determined, the DIP Main Account will be used to fund one or

more disbursement accounts (the "DIP Disbursement Accounts"), out of which the Debtors will pay vendors, payroll, and other obligations, similar to the manner that the Debtors funded and used the prepetition Operating Accounts.  A diagram representing the DIP Cash Management System is attached as Exhibit B to the Cash Management Motion.

89.     I believe that the relief requested in the Cash Management Motion is required to minimize the disruption of the Cash Management System and the Debtors' bank accounts and to assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

D.      MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY PREPETITION EMPLOYEE WAGES, BENEFITS, AND RELATED ITEMS ("EMPLOYEE WAGE MOTION")

90.     By the Employee Wage Motion, the Debtors seek an order of the Court authorizing them to pay (i) any outstanding Prepetition Compensation and Prepetition Deductions; (ii) Prepetition Business Expenses; (iii) the Supplemental Workforce Obligations; and (iv) any prepetition amounts under the Health Benefits Program that the Debtors later discover are outstanding.

***Prepetition Compensation and Prepetition Deductions***

91.     The Debtors employ approximately 250 employees.  Depending on their respective roles, employees earn wages and compensation based on two compensation models. Employees working in Debtors' warehouse and call center earn hourly wages.  All other employees are salaried.  The Debtors' employees' skills, specialized knowledge, and understanding of the Debtors' operations, as well as their relationships with customers, vendors, and other third parties, are essential to the Debtors' operations.

92.     The Debtors' salaried employees are not owed for Prepetition Compensation and Prepetition Deductions (as defined below) because the Debtors commenced these chapter 11 cases one day after ADP, LLC, the Debtors' payroll administrator, withdrew the necessary funds

28

from Debtors' payroll operating account to pay employees on the regularly-scheduled payroll date of September 15, 2016.

93.    Debtors currently pay approximately 101 employees on an hourly basis (the "Hourly Workers"). The paychecks these employees receive on September 15, 2016 (which were funded on September 13, 2016) will cover work performed from August 21, 2016 to September 10, 2016. As a result, the work these employees performed from September 11, 2016 through the Petition Date has not yet been paid (the "Prepetition Compensation"). Debtors estimate that the total Prepetition Compensation for all Hourly Workers is approximately $28,849.14.

94.    The Debtors make deductions from the Hourly Workers' paychecks to make payments on behalf of the employees for or with respect to, among other things, the Debtors' employee benefit programs and amounts due third parties on account of various federal, state or local income, FICA, Medicare, state disability, workers' compensation and other taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Prepetition Deductions"). The Debtors estimate that the outstanding Prepetition Deductions total $2,884.91.

95.    I believe that authorizing the Debtors to honor and pay any and all Prepetition Compensation and Prepetition Deductions, and to continue, during the course of these cases, to pay salary, wages, overtime pay, commissions, and other compensation to the Debtors' employees in accordance with the Debtors' policies and in the ordinary course of business is critical to maintaining the Debtors' businesses.

**Prepetition Business Expenses**

96.    The Debtors customarily reimburse their employees for a variety of business expenses incurred in the ordinary course of their business, including airfare, hotels, meals during

travel, other transportation expenses, postage and packaging, office supplies, fuel, and merchandise samples. To obtain reimbursement of business expenses, an employee is required to submit an expense report for approval by the applicable department head and by the accounting department. In addition, a small number of employees have access to a company American Express card. In a typical month, the Debtors reimburse employees for approximately $25,000.00 of expenses.

97.    It is likely that certain employees have not been reimbursed for Prepetition Business Expenses incurred prior to the Petition Date. In this regard, I understand that it is difficult for the Debtors to determine the exact amount of Prepetition Business Expenses that are outstanding because, among other things, employees may not have submitted reimbursement forms for all accrued expenses. Nevertheless, I believe that it is critical that the Debtors be authorized to reimburse all such expenses when the reports are submitted, in order to assure such employees that they will be reimbursed for their actual out-of-pocket expenses incurred while acting within the scope of their employment.

98.    Based on the company's books and records, the Debtors estimate that their obligations for Prepetition Business Expenses as of the Petition Date will not exceed $15,200.00.

***Prepetition Benefits***

99.    In the ordinary course of business, the Debtors maintain an array of benefits for their employees, including the following: (a) health-related benefits, such as medical, dental, vision; and (b) voluntary benefits, such as life insurance, and short- and long-term disability insurance, and access to a 401(k) plan; and (c) paid time off benefits.

30

### a.    Health-Related Benefits

100.    The Debtors provide their employees with various health-related benefits (the "Health Benefits Program"). The Health Benefits Program is not self-insured. The network provider for the medical, dental, and vision plans is CIGNA. Debtors also provide a medical plan through Kaiser. As of the Petition Date, I believe that the Debtors are current on all of their obligations under the Health Benefits Program. However, I believe that it is critical that the Debtors be authorized to pay any prepetition amounts under the Health Benefits Program that may be outstanding in order to ensure that there is no disruption to employees' health-related coverage.

### b.    Voluntary Benefits

101.    The Debtors offer certain benefits to employees without contribution, such that the cost was passed along entirely to participants. These benefits include short- and long-term disability insurance, life insurance, and access to a 401(k) plan (to which Debtors do not match Employee contributions) (the "Voluntary Benefits"). As of the Petition Date, the Debtors have passed along to the benefit providers all amounts withheld from employee paychecks. However, in the event that there are any prepetition Voluntary Benefits outstanding, I believe it is critical that the Debtors be authorized to pay such amounts in order to ensure that their disability and life insurance coverage and 401(k) plan access do not suffer interruption or discontinuation.

### c.    Paid Time Off Benefits

102.    The Debtors also offer paid time off (the "Paid Time Off Benefits"). The Debtors currently offer unlimited paid time off, rather than fixed accruals over time, but, until October 2012, the Debtors' employees accrued paid time off in fixed increments. The Debtors have accrued $190,330.00 in paid time off obligations. I believe that permitting the Debtors to offer

their employees to take any accrued paid time off in vacation time is important to maintaining morale during this difficult time.  Thus, I believe that continuation of the paid time off obligations is necessary under the circumstances, and that the Debtors should further be authorized to pay such accrued paid time off amounts only if required under applicable law.

### d.    Social Security, Income Taxes, and Other Withholdings

103.    As required by law, the Debtors and/or their payroll services routinely withhold from employees' paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholdings include Social Security, FICA, federal, state and local income taxes, healthcare payments, and similar items.  I have been advised that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates.  Therefore, I believe that the Debtors' practice of directing such funds to the appropriate parties is in the ordinary course of business and is appropriate, and that the Debtors should be authorized to continue such practice.

### e.    Continuation of Benefits Postpetition

104.    For the continued benefit and well-being of their employees, the Debtors plan to continue to provide, in the ordinary course of business, medical, dental, and vision benefits, voluntary benefits, and the miscellaneous benefits described above.  I believe that continuing to provide such benefits in the ordinary course of business is critical to maintaining the workforce during this important time.

### *The Supplemental Workforce*

105.    In the ordinary course of business, the Debtors utilize the services of certain independent contractors and employment agencies (the "Agencies") in connection with providing or engaging a supplemental workforce (the "Supplemental Workforce" and each

32

member thereof, a "Supplemental Worker"). The Supplemental Workforce provides a variety of

services for the Debtors, including warehouse and call center staffing, sales, accounting, and web

design. Though the Supplemental Workforce fluctuates to meet the Debtors' business needs, as

of the Petition Date, the Debtors have slightly fewer than fifty Supplemental Workers who are

owed money for their labors.

106.    The individuals who constitute the Supplemental Workers are not on the Debtors'

payroll; the Debtors do not pay wages, withhold taxes or provide benefits for the Supplemental

Workers. Supplemental Workers who are not hired through Agencies (*i.e.*, independent

contractors), are responsible for their own taxes and benefits.

107.    The Supplemental Workers include two groups:

(a)    Approximately nineteen individuals who, collectively, are owed a total of approximately $37,000.00 for hourly work.

(b)    Approximately twenty-eight sales agents at the Debtors' office in Costa Mesa, California, who are paid entirely for commissions earned. As of the Petition Date, the amount owed to these independent contractors is approximately $458,711.00 in total.

108.    I believe that the relief requested in the Employee Wage Motion, including paying

the Supplemental Workers, is required to preserve employees' morale during these chapter 11

cases and to ensure that employees whose skills, specialized knowledge, understanding of the

Debtors' operations, and relationships with customers, vendors, and other third parties, are

available to assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

E.    MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY THE
      DEBTORS TO PAY CERTAIN PREPETITION SHIPPING AND PROCESSING
      CHARGES ("SHIPPERS MOTION")

109.    By the Shippers Motion, the Debtors seek an order of the Court (i) authorizing but

not directing them to pay certain prepetition shipping, processing and related charges that are

owed, either directly or indirectly, to certain Distribution Vendors in an aggregate amount not to

33

exceed $150,000.00; and (ii) authorizing all applicable banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the prepetition obligations described in the Shippers Motion.

110.    In connection with the day-to-day operation of their business, the Debtors rely on a network of third party shippers, haulers, common carriers, truckers and other transporters, freight forwarders, and related shipping services, (collectively, the "Shippers") to coordinate transportation of their merchandise between and among vendors, the Debtors' and third-party warehouses, and, eventually, the Debtors' customers.  The scale of these shipments and logistics varies significantly, ranging from companies that ship pallets of heavy cargo to those that handle individual items or packages for customers (*e.g.*, the non-freight businesses of FedEx, UPS, and USPS).  Such shipments occur at all hours of every day and are necessary to the delivery, distribution, and sale of goods ordered through the stores powered by Debtors' platforms to customers throughout the United States and the world.  The Debtors also rely on their Shippers to return goods, merchandise and products from the Debtors' customers or to the Debtors' vendors.

111.    The Debtors also rely on certain third-party fulfillment services companies (the "Processors") to assist with the distribution of Debtors' merchandise to customers.  The Debtors store their merchandise in the Processors' storage facilities, and, when a certain product is ordered by a customer, the Processor packs and ships it.  To perform their services, the Processors temporarily take possession of and store large quantities of the Debtors' products and materials in their own warehouses during the distribution process.

112.    Typically, the Debtors have agreed-upon rates for the services of the Shippers and the Processors (collectively, the "<u>Distribution Vendors</u>").  The Distribution Vendors are not paid in advance; instead, they invoice the Debtors for shipping, processing and storing services previously rendered, providing the Debtors with viable trade terms and liquidity.  The Debtors estimate that as of the Petition Date, the value of the Debtors' products in transit using the services of the Distribution Vendors is approximately $150,000.  If the Debtors fail to pay the Distribution Vendors for charges incurred in connection with the transportation, shipping, delivery or processing of the products sold through the stores powered by Debtors' platform, the Distribution Vendors might assert possessory liens against the Debtors' property that is in the possession of the Distribution Vendors.  In most cases, the Debtors believe that the value of the products that may be in the possession of the Distribution Vendors is significantly more than the prepetition charges owed to the Distribution Vendors.

113.    If the Distribution Vendors assert possessory liens and refuse to release the Debtors' products—or even if they simply delay shipments of those products or materials—the resulting disruption to the Debtors' supply chain and distribution operations would lead to significant adverse consequences to the Debtors' businesses.  If products in the possession of the Processors or in transit with a Shipper are lost, or if the Debtors are unable to provide these goods to customers on a timely basis, the Debtors could suffer a significant loss of credibility and customer goodwill, which would harm the Debtors' business and reorganization efforts.

114.    I believe that the relief requested in the Shippers Motion is required to ensure that the Debtors are able to maintain their manufacturing and distribution network in order to efficiently administer their estates and maximize value.

DOCS_DE:209564.1 17973/001

F.    MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION TAXES ("TAXES MOTION")

115.    By the Taxes Motion, the Debtors seek an order of the Court (i) authorizing but

not directing them to pay, in the ordinary course of business, certain Prepetition Taxes due and

owing to the Taxing Authorities (as defined below) and (ii) authorizing all applicable banks and

other financial institutions (collectively, the "Banks"), when requested by the Debtors, to receive,

process, honor and pay any and all prepetition and postpetition checks presented for payment,

and to honor all fund transfer requests made by the Debtors, related to the Taxes Motion,

provided that sufficient funds are available in the applicable accounts to make the payments.

116.    The Debtors owe the following categories of prepetition taxes to various taxing

authorities (collectively, the "Taxing Authorities"):

    a.    **Sales Taxes**

117.    In the ordinary course of business, the Debtors collect and remit to certain Taxing

Authorities a variety of sales taxes, local gross receipts, and other similar taxes in connection

with the sale of merchandise to their customers (collectively, the "Sales Taxes"). The Debtors

estimate that the aggregate amount of Sales Taxes owing to the Taxing Authorities as of the

Petition Date is approximately $568,097.

118.    Of the foregoing sum, $307,981 relates to dated taxes owing in Colorado and

Connecticut. The Debtors have determined that these sums are payable and seek authority to pay

them.

119.    The balance, or $260,116, reflect relatively recent taxes that have been incurred in

the ordinary course and that the Debtors wish to pay in the ordinary course.

    b.    **Business License Fees**

36

120.    Certain municipal and county governments require businesses to obtain business licenses and pay corresponding business license fees (the "Business License Fees").  The Debtors are subject to such Business License Fees in three local jurisdictions.  The Debtors estimate that the aggregate amount of the Business License Fees owing to the Taxing Authorities as of the Petition Date is approximately $27,343.01.  However, based on past experience, it is possible that additional business license fees have not been communicated to the Debtors.  Accordingly, the Debtors request additional authority to pay any prepetition obligations for business licenses as necessary to continue operations.

### c.    Other Taxes

121.    Many federal, state and local Taxing Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain taxes or fees in the event that such taxes or fees are not paid by the Debtors.  Thus, if any such taxes or fees remain unpaid, the Debtors' directors and responsible officers may be subject to lawsuits or even criminal prosecution on account of nonpayment during the pendency of these chapter 11 cases.  Such lawsuits or proceedings would constitute a significant distraction for the Debtors' directors and responsible officers at a time when they should be focused on the Debtors' efforts to preserve and maximize value for all stakeholders.

122.    Although the Debtors believe that all taxes and fees for which the Debtors' directors and/or responsible officers may be personally liable are described herein, it is possible that other prepetition obligations, which carry similar liability, may be uncovered by the Debtors subsequent to the filing of this motion.  To the extent that such prepetition obligations exist, the Debtors seek authority to treat them as Prepetition Taxes as that term is defined and used in the Taxes Motion and pay them as they are discovered or arise.

123.    I believe that the relief requested in the Taxes Motion is required to ensure that

the Debtors remain in good standing in the jurisdictions in which they do business, to avoid

audits by the Taxing Authorities, and to avoid personal liability to the Debtors' officers and

directors, all of which would distract from the smooth operation of these chapter 11 cases.

G.    MOTION FOR INTERIM AND FINAL ORDERS ESTABLISHING ADEQUATE
      ASSURANCE PROCEDURES WITH RESPECT TO THE DEBTORS' UTILITY
      PROVIDERS ("UTILITIES MOTION")

124.    By the Utilities Motion, the Debtors seek an order of the Court (i) granting them

authority to make the Adequate Assurance Deposit (as defined below) to satisfy their obligations

to provide adequate assurance to Utility Companies under section 366 of the Bankruptcy Code

and (ii) requiring any Utility Companies seeking additional assurance to follow the procedures

set forth in the Utilities Motion.

***The Utility Companies***

125.    The Debtors rely on utility services, including, but not limited to, telephone,

internet, gas and electric, waste removal, and water (collectively, the "Utility Services") provided

by the Utility Companies, including those identified on Exhibit A attached to the Utilities Motion

(the "Utility Service List") to operate their business.[7]  The Debtors estimate that their average

monthly obligations to the Utility Companies on account of services rendered total

approximately $76,913.00.

126.    Uninterrupted service from the Utility Companies is essential to maintaining the

Debtors' ongoing operations and to preserving value for all interested stakeholders.  The Debtors

operate five offices and one warehouse in four states.  For the Debtors to preserve the value of

---

[7]    For each Utility Company, Exhibit A identifies, to the extent known: (i) the name and type of service of the
Utility Company and (ii) the address for the Utility Company.  The inclusion of any entity on, or any omission
of any entity from, Exhibit A is not an admission by the Debtors that such entity is or is not a utility within the
meaning of section 366 of the Bankruptcy Code, and the Debtors reserve their rights with respect thereto.  In
addition, the Debtors are requesting that this Motion apply to all their utility companies, whether or not any
given utility company is included on the Utility Service List.

their estates, their operations must continue to operate without interruption. Any temporary or permanent discontinuation of utility services could irreparably disrupt the Debtors' business operations and, as a result, diminish recoveries to the Debtors' stakeholders.

***The Proposed Adequate Assurance***

127.    Section 366(c)(2) of the Bankruptcy Code requires the Debtors to provide the Utility Companies with adequate "assurance of payment" within thirty days of the commencement of these cases to prevent the Utility Companies from altering, refusing or discontinuing service. The Debtors propose to provide "adequate assurance" in two ways. First, they intend to pay any postpetition obligations to the Utility Companies in a timely fashion in the ordinary course of their business. To that end, the Debtors have budgeted for the payments and will make them from their cash reserves as of the Petition Date and/or through anticipated access to the DIP Facility.

128.    Second, the Debtors propose to deposit, as adequate assurance of payment, approximately $38,000.00 into a newly created, segregated, interest bearing account (the "Adequate Assurance Deposit") within 20 days of the Petition Date. The Adequate Assurance Deposit equals approximately two weeks of the Debtors' estimated utility expenses. I believe that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Companies.

129.    I believe that the relief requested in the Utilities Motion is required to minimize disruptions to the Debtors' operations and therefore to maximize value for the Debtors' chapter 11 estates.

H.    MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE CERTAIN CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS ("CUSTOMER PROGRAMS MOTION")

130.    By the Customer Programs Motion, the Debtors seek an order of the Court authorizing, but not obligating, the Debtors to (i) maintain and administer the Customer Programs; (ii) honor prepetition obligations to customers related thereto in the ordinary course of business; and (iii) continue, replace, implement, modify and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court.

***The Gift Card Program***

131.    In the ordinary course of business, the Debtors sell electronic gift cards (collectively, the "Gift Cards")[8] to customers in amounts ranging from $5 to $500.  Customers can purchase Gift Cards from the online stores of the Debtors' television and music industry partners.[9]  The Gift Cards are branded with the logo of Debtors' partners, but fulfillment and shipment of the order is conducted by the Debtors and their affiliates.  Gift card programs of this nature are commonplace and popular in the ecommerce industry, and the Debtors' competitors offer similar programs to their customers.

132.    As of the Petition Date, the Debtors estimate that their customers hold Gift Cards with an outstanding aggregate value of approximately $815,000.00.  The vast majority of these unredeemed Gift Cards are over a year old, and the Debtors expect the redemption rate to be very

---

[8]    All of the Gift Cards currently issued by the Debtors are electronic.  However, Debtors issued a small number of physical Gift Cards pre-2014.  The Debtors are unable to track the exact amount of funds outstanding on such Gift Cards.  However, given the age of the Gift Cards, the Debtors estimate that customers are unlikely to seek to redeem them in the future.

[9]    Debtors currently issue gift cards for the online stores of eighteen partners in the television industry and 31 in the music industry.

low.  The Debtors request the authority, but not the obligation, to honor all Gift Cards purchased and to continue honoring Gift Cards in the ordinary course of business.

***The Refund and Exchange Program***

133.   The Debtors allow their customers to return or exchange certain eligible purchased merchandise within thirty days of purchase if the merchandise is unworn and unwashed and all tags remain attached (the "Refund and Exchange Program").  Refunds may be made if the customer presents the original sales receipt.

134.   Programs like the Refund and Exchange Program are common in the e-commerce industry, and similar programs are used by the Debtors' competitors.  As of the Petition Date, the Debtors may have outstanding obligations to its customers pursuant to the Refund and Exchange Program as and when customers present merchandise for returns.  Debtors estimate that the average monthly cost of the Refund and Exchange Program is $57,000.00.  The Debtors request the authority, but not the obligation, to honor prepetition obligations associated with the Refund and Exchange Program and to continue honoring the Refund and Exchange Program postpetition in the ordinary course of business.

***Credit Cards and Payment Processors***

135.   In addition to the Gift Cards discussed above, the Debtors accept several methods of payment from customers at their point of sale:  (i) Visa, MasterCard, Discover, and American Express credit cards; (ii) checks (for phone or catalog orders only); (iii) PayPal; (iv) Visa Checkout; and (v) MasterCard Checkout (collectively, the "Credit Cards and Payment Processors").  For all methods of payment other than checks, the Debtors receive the net customer sales less any chargebacks, returns, and any processing fees charged.  The processing fee charged by each company varies, but across all Credit Cards and Payment Processors,

41

Debtors are charged approximately three percent per transaction. The fees owing to these companies are set off from the funds that are remitted to the Debtors on a daily basis.

136.    Maintaining use of the Credit Cards and Payment Processors is essential to the continuing operation of the Debtors' business because the vast majority of the Debtors' sales are made using these payment methods. The Debtors estimate that the average monthly cost of the fees to the Credit Cards and Payment Processors is $157,000.00. By this Motion, the Debtors request the authority, but not the obligation, to allow the Credit Cards and Payment Processors to continue to process the customer payments, including deducting chargebacks and returns, in the ordinary course of business. The Debtors also request the authority, but not the obligation, to continue to allow these companies to offset pre-petition fees.

***Prepetition Customer Purchases***

137.    As of the Petition Date, certain customers have purchased goods from the Debtors' partners' online stores, but these orders have not yet been fulfilled (the "Prepetition Customer Purchases"). The Debtors estimate that approximately $304,000.00 of such sales are outstanding as of the Petition Date. The Debtors request the authority, but not the obligation, to honor these Prepetition Customer Purchases in their sole discretion.

138.    I believe that the relief requested in the Customer Programs Motion is required to maintain the loyalty, support, and goodwill of customers, which is critical to the Debtors' sale efforts.

I.    MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO PAY THE PREPETITION INSURANCE OBLIGATIONS (THE "INSURANCE MOTION")

139.    By the Insurance Motion, the Debtors seek an order authorizing them to pay the Prepetition Insurance Obligations (as defined herein).

DOCS_DE:209564.1 17973/001

140.    In connection with the operation of their business, the Debtors maintain workers' compensation and general liability insurance programs, which provide the Debtors with insurance coverage for claims relating to, among other things, workers' compensation, automobile losses and liability, directors' and officers' liability, general and umbrella liability, employment practices liability, property, and errors and omissions / cyber liability (collectively, the "Insurance Programs") through different insurance carriers (the "Insurance Carriers") including, but not limited to, the Insurance Programs and Insurance Carriers identified in Exhibit A to the Insurance Motion.

141.    The Debtors are required to pay, either directly or through the Debtor's insurance broker, premiums for coverage under the Insurance Programs noted above, including under the Debtor's Workers' Compensation Program (collectively, the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for most of the Insurance Programs are determined annually and are paid at the inception of each policy, on a monthly basis, or pursuant to the terms of the applicable insurance premium financing agreement.  The Debtors seek authorization to satisfy these obligations as they become due in the ordinary course of business.

142.    As of the Petition Date, $7,280.00 was outstanding under Debtors' workers' compensation policy.  The Debtors also currently owe $9,442.00 on their commercial liability package (property and general liability), and $2,468.00 on umbrella liability (collectively, and together with any other prepetition obligations arising under the Insurance Programs, in a total amount not to exceed $50,000, the "Prepetition Insurance Obligations").  The Debtors seek authorization to satisfy the Insurance Obligations.  A schedule of the Prepetition Insurance Obligations is attached as Exhibit B to the Insurance Motion.

DOCS_DE:209564.1 17973/001

143.    I believe that the relief requested in the Insurance Motion is required because the nature of the Debtors' business and the extent of its operations make it essential for the Debtor to maintain its Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew the Insurance Policies or refusing to enter into new insurance agreements with the Debtors in the future.

**APPLICATION RELATING TO PROFESSIONAL RETENTION**

J.    APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO 28 U.S.C. § 156(C) APPROVING THE RETENTION AND APPOINTMENT OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS THE CLAIMS AND NOTICING AGENT TO THE DEBTORS, EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE ("EPIQ RETENTION APPLICATION")

144.    By the Epiq Retention Application, the Debtors seek an order an order approving the retention and employment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent to the Debtors in lieu of the Clerk, *nunc pro tunc* to the Petition Date.

145.    I believe that the relief requested in the Epiq Retention Application is required to relieve the Debtors of the burden of noticing thousands of parties during the course of these chapter 11 cases, thus enabling the Debtors to devote their full attention and resources to their chapter 11 process.

**MOTIONS RELATED TO ADMINISTRATION OF DEBTORS' CHAPTER 11 CASES**

K.    MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) FILE A CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MAILING MATRIX FOR EACH DEBTOR AND (II) REDACT CERTAIN PERSONAL IDENTIFICATION INFORMATION FOR INDIVIDUAL CREDITORS ("CONSOLIDATED CREDITOR MATRIX MOTION")

146.    By the Consolidated Creditor Matrix Motion, the Debtors seek an order authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting separate

44

mailing matrices for each Debtor and (ii) redact certain personal identification information for individual creditors.

147.   I believe that the relief requested in the Consolidated Creditor Matrix Motion is required to relieve the Debtors of the burden of requiring the Debtors to segregate and convert their computerized records to generate a Debtor-specific creditor matrix format, which would be unnecessarily burdensome and would result in duplicate mailings.

L.   MOTION FOR ENTRY OF AN ORDER DIRECTING THE JOINT ADMINISTRATION OF THE DEBTORS' CHAPTER 11 CASES ("JOINT ADMINISTRATION MOTION")

148.   By the Joint Administration Motion, the Debtors seek an order (i) directing the joint administration of the Debtors' chapter 11 cases and the consolidation thereof for procedural purposes only; (ii) directing parties in interest to use a consolidated caption in substantially the form provided in the proposed order approving the Joint Administration Motion (the "Proposed Caption") indicating that any pleading they file relates to the jointly administered bankruptcy cases of "Delivery Agent, Inc., *et al.*"; and (iii) ordering that an entry be made on the docket in the chapter 11 cases of each of the Debtors other than Delivery Agent, Inc. indicating the joint administration of the Debtors' chapter 11 cases.

149.   I believe that the relief requested in the Joint Administration Matrix Motion is required to render the completion of various administrative tasks less costly, minimize the number of unnecessary delays associated with the administration of separate chapter 11 cases, and avoid the need for duplicative notices, motions and applications, thereby saving time and expense, all of which will enable the Debtors to smoothly transition to operating in chapter 11

*Remainder of page intentionally left blank*

45

I declare under penalty of perjury that the foregoing is true and correct.

Executed in San Francisco, California on September 14, 2016.

James Jeffrey Hagan